## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### CASE NO. 25-cv-252

JETT LAWRENCE and
HUNTER LAWRENCE,

      Plaintiffs,

v.

LUCAS MIRTL,

      Defendant.

_____/

### COMPLAINT

Plaintiffs Jett Lawrence and Hunter Lawrence (collectively, the "Lawrences") hereby sue Defendant Lucas Mirtl ("Mirtl") for money damages, return of misappropriated personal property, and an accounting, and allege:

### SUMMARY OF THE CASE

1.    This case involves Mirtl's systemic misappropriation of hundreds of thousands of dollars from Jett and Hunter Lawrence, his two clients. The Lawrences are two professional Motocross racers who are in their twenties. Mirtl, who until recently was their sports agent, oversaw virtually all aspects of their professional careers and was entrusted to operate and manage various business ventures related thereto.

2.    Specifically, Mirtl managed and/or controlled, including with signatory authority, certain bank accounts, including the Wells Fargo bank account at issue, Wells Fargo Account No. X-8049, in the name of Jettson Donuts LLC, which was maintained for the ultimate financial benefit of the Lawrences.

3.    However, rather than manage these finances for the benefit of the Lawrences, Mirtl abused his position of trust and stole a significant amount of money from at least one account – Wells Fargo Account No. X-8049 – for his own personal benefit.

4.    The total amount Mirtl looted from the Lawrences is estimated to exceed *$600,000*. This amount includes (a) over $360,000 in direct looting of the Lawrences' account; and (b) another $240,000 in lost sponsorship money from Alpinestars that was withheld because Mirtl inexplicably failed to repay Alpinestars for the cost of replica gear and merchandise—in spite of the fact that the merchandise was indeed sold to retail consumers, and all net retail sales proceeds were paid into the Wells Fargo Account No. X-8049.

5.    Worse yet, it is unclear whether there are additional funds that Mirtl may have misappropriated, and the Lawrences, themselves and through their other professionals, continue to identify additional misappropriations of money by Mirtl on an almost daily basis.

6.    As an example of the depths of his breach of trust, Mirtl paid his

personal legal fees for his divorce from Wells Fargo Account No. X-8049. Also, from this same account, Mirtl paid for the purchase of a motorhome for the benefit of two other related motocross racers in Europe whom Mirtl also manages.

7.    If this were not shocking enough, Mirtl also transferred huge sums of money directly to his personal bank account. The list goes on, including substantial personal-related American Exprss and Venmo payments to multiple individuals, including several inexplicable payments made to one former professional motocross racer, from Wells Fargo Account No. X-8049, as further described below.

8.    The Lawrences did not know about these transactions and did not authorize them.

9.    As such, the Lawrences bring this action for conversion, unjust enrichment, breach of fiduciary duty, replevin, and an accounting.

10.    In addition, this Complaint will likely be amended in the near future for a claim for civil theft, assuming Mirtl does not return to the Lawrences the full amount of misappropriated funds within 30 days of the civil theft demand letter to be served on him in due time.

## THE PARTIES

11.    Jett    Lawrence ("Jett")    is    an    Australian-born    motocross professional racer.

12.    Jett has competed in the AMA Supercross and Motocross Championships.  He is a one-time 450cc AMA Supercross and 450cc AMA Motocross Champion, and a two-time 450cc SMX, 250cc AMA Motocross, and 250cc AMA Supercross Champion.

13.    Jett was the 2020 Marty Smith Pro Rookie of the Year in the 250cc class for the AMA Motocross Championship. He also received the Ricky Carmichael Award at the 2022 Motocross des Nations.

14.    Hunter Lawrence ("Hunter") is Jett's brother.  Hunter is also an Australian-born professional motocross rider.

15.    Hunter has competed in the Motocross World Championships from 2017 to 2018, and the AMA Supercross and Motocross championships since 2019.  He is a one-time AMA Supercross 250cc East and 250cc AMA Motocross Champion.

16.    The Lawrences are individuals who are citizens of the State of Florida and are residents of Pasco County, Florida.

17.    Mirtl was the Lawrences' sports agent for at least seven years and was terminated as their sports agent on or about January 23, 2025.  As stated above, Mirtl has misappropriated an unknown, still to be fully determined, amount of money totaling in the six figures from the Lawrences in at least one account at Wells Fargo.

18.    Mirtl is also in possession of personal property belonging to the

Lawrences, including valuable apparel and memorabilia, and has refused to return such property to them.

19.    Mirtl is an individual who is a citizen and resident of the State of Texas.

20.    There may be other parties who are currently not named as defendants herein, but who may be liable to the Lawrences.  By not naming such parties at this time, the Lawrences are not waiving their right to amend to add such parties, should the facts warrant.

## JURISDICTION AND VENUE

21.    This is an action for damages of more than $75,000, exclusive of interest, attorneys' fees and costs.

22.    Although the Lawrences' total amount of monetary damages is currently unknown, the known amount currently is estimated to exceed $600,000, including funds Mirtl misappropriated and lost sponsorship money. This figure is expected to increase as the Lawrences unravel Mirtl's misconduct.

23.    The Lawrences also intend to seek punitive damages as this action proceeds.

24.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).  As set forth above, there is complete diversity between the parties, and more than $75,000 is at issue in this action, exclusive of fees/costs/interest.

25.    This Court has personal jurisdiction over Mirtl pursuant to Florida Statute § 48.193(1)(a)(1) because Mirtl conducted or engaged in business in Florida.

26.    This Court also has personal jurisdiction over Mirtl pursuant to Florida Statute § 48.193(1)(a)(2) because Mirtl committed tortious acts which touched, concerned, and affected Florida.

27.    Venue is proper in this Court pursuant to Florida Statutes § 47.011. For example, venue is proper in this District because the Lawrences reside in this District and/or the business venture underlying the Lawrences' claims occurred in this District.

## GENERAL ALLEGATIONS

### A. Summary of Wells Fargo Accounts

28.    Mirtl oversaw the deposits of funds belonging to, and owned by, the Lawrences, including into Wells Fargo Account No. X-8049, in the name of Jettson Donuts LLC, and Account No. X-2988, in the name of Jettson Donuts Genesis, Inc.

29.    The purpose of Wells Fargo Account No. X-8049 is to receive revenues owned by and owed to the Lawrences for: (i) VIP access at races for their fans; and (ii) replica gear and merchandise the Lawrences sold.

30.    Based on the Lawrences' review of the transactions in Wells Fargo Account No. X-8049, Mirtl has been repeatedly transferring substantial funds

owned by the Lawrences to himself and repeatedly paying substantial personal-related transactions without the Lawrences' knowledge or their authorization.

## B. <u>Unauthorized Divorce Transfers</u>

31.    For example, Mirtl made several transfers related to his divorce totaling at least ***$18,075***, including the following non-exhaustive transfers: (i) August 21, 2024 – wire transfer of $7,500 to Balekian Hayes (divorce law firm); (ii) December 3, 2024 – Venmo transfer of $3,075 to Lela Mirtl (Mirtl's soon-to-be ex-wife); and (iii) December 11, 2024 – wire transfer of $7,500 to Balekian Hayes (again, divorce law firm).

32.    Additionally, on at least one other occasion, Mirtl wired funds from Account No. X-8049 to a divorce law firm, only to have the funds returned almost immediately.  On August 20, 2024, Mirtl wired $15,000 to the law firm of Nace and Motley, LLP, but the funds returned the next day, on August 21, 2024.  It is unclear whether these funds were rejected by the recipient or recalled by Mirtl.

33.    The Lawrences did now know about and/or authorize these transactions.

## C. <u>Unauthorized Motorhome Purchase</u>

34.    Similarly, and again from Wells Fargo Account No. X-8049, Mirtl wire-transferred nearly $45,000 to BNP Paribas Fortis/Beneficiary: Paul

Sannen for a motorhome purchase on November 7, 2024.

35.    Paul Sannen,  https://paulsannen.com/, is a luxury motorhome company in Lommel, Belgium.

36.    Upon information and belief, two of Mirtl's clients in Europe had been looking to purchase a new motorhome for the 2025 MXGP season, and Mirtl agreed to finance a portion of the purchase.

37.    The Lawrences did not buy or rent any motorhome from Paul Sannen and did not know about and/or authorize this transaction.

38.    Thus, unbeknownst to Mirtl's two other clients who were buying the motorhome, Mirtl took the Lawrences' money for the benefit of his other clients (and, to the extent it might ingratiate him to the other clients) and to the detriment of the Lawrences.

**D. Unauthorized Online Transfers to Mirtl Directly**

39.    Mirtl also transferred from Wells Fargo Account No. X-8049 more than 30 online transfers to himself directly of additional monies totaling at least **_$140,000_**, including, but not limited to, listing some of the transfers as "loans to be paid back by EOM" when no such loans were ever discussed or approved by the Lawrences.  Additionally, Mirtl attempted to mask his fraud by labeling some of transfers as "commissions" or "advances on commissions" or "consulting fees". Some transfers were not labeled at all and were just transferred to his personal account.

40.    In fact, Mirtl was not authorized to receive any funds directly from any accounts of the Lawrences, including Wells Fargo Account No. X-8049, for any commissions or reimbursements of expenses allegedly due to Mirtl.

41.    Instead, Mirtl's compensation and reimbursements for bona fide business expenses, including travel and lodging, would be paid by Mirtl's employer, Wasserman Media Group, pursuant to the terms and conditions of Mirtl's agreement with Wasserman Media Group.

42.    Again, the Lawrences did now know about and/or authorize these transactions.

### E. Unauthorized American Express Payments

43.    In addition, Mirtl made many unauthorized and/or personal-related American Express payments/transfers totaling at least ***$50,000*** from Wells Fargo Account No. X-8049 for a personal card in Mirtl's name.

44.    The Lawrences did now know about and/or authorize these transactions.

### F. Unauthorized Venmo Transfers

45.    Mirtl also made many unauthorized and/or personal-related Venmo payments/transfers, including those for a babysitter for Mirtl's child, totaling at least ***$15,000*** from Wells Fargo Account No. X-8049.

46.    Again, the Lawrences did now know about and/or authorize these transactions.

9

### G. <u>The Failure to Repay Alpinestars</u>

47.    As indicated above, the purpose of Wells Fargo Account No. X-8049 was to receive revenues derived from (i) fees for VIP access at races for their fans; and (ii) replica gear and merchandise the Lawrences sold.

48.    Alpinestars, a motocross apparel company which sponsors the Lawrences, sold replica gear and merchandise to the Lawrences.

49.    Mirtl accepted the gear and merchandise on behalf of the Lawrences and then sold them to Feld Entertainment Inc. which was contracted to sell the replica gear and merchandise at the races. Mirtl then failed to pay back Alpinestars with the money from the sale of the gear and merchandise to Feld.

50.    From January 2024 through June 2024, Alpinestars contacted Mirtl requesting the repayment of $240,000, representing the value of the gear and merchandise Mirtl accepted from Alpinestars.

51.    Mirtl responded that he would repay the $240,000 but failed to do so after repeated requests from Alpinestars to pay the applicable invoice. Accordingly, Alpinestars recouped the $240,000 by withholding that amount from the sponsorship fees owed to the Lawrences.

52.    As a result, Mirtl caused the Lawrences to lose $240,000 in sponsorship fees.

### H. Mirtl Used the Lawrences' Own Money to Pay Fees Owed to them from Another Rider

53.    The Lawrences bought a company, Eighty Three Holdings LLC, which owns a private training compound, and allowed some other riders to train there for an annual fee.

54.    One of the riders, who was also managed by Mirtl, was late making payment for the annual fee.

55.    Shockingly, Mirtl paid the fees that were due for his other rider by using the Lawrences' own money.  On July 1, 2024, Mirtl wired the fees that were due, $6,300, from Wells Fargo Account No. X-8049 to a bank account at City National Bank for Eighty Three Holdings LLC.  In other words, Mirtl used the Lawrences' money to pay the fees owed to the Lawrences by another rider.

### I. The Demand Letter

56.    As stated above, the exact amount of money misappropriated by Mirtl is currently unknown, but it exceeds $600,000

57.    As also stated above, none of the above transfers or payments were for the benefit of the Lawrences and all such transfers were unauthorized.

58.    On or about January 23, 2025, the Lawrences sent a demand letter to Mirtl.  A copy of the demand letter is attached as **Exhibit A**.

59.    As part of the demand letter, the Lawrences terminated Mirtl as their sports agent.

60.    The Lawrences also advised Mirtl that he no longer has any authorization to act on their behalf in any capacity.

61.    The Lawrences demanded that Mirtl refrain from accessing any bank accounts or any other accounts holding any assets of the Lawrences.

62.    Further, Mirtl has been in possession of certain removable property of the Lawrences, including race apparel and memorabilia that they have previously requested be returned.

63.    Thus, the Lawrences also demanded that Mirtl return all such property in his possession, custody, or control wherever located and instructed him not to sell or transfer possession in any way any of the Lawrences' apparel/memorabilia.

## J. **Mirtl's Failure to Cure**

64.    Mirtl has not returned to the Lawrences the misappropriated funds or their apparel/memorabilia, has failed to identify the location of such property, and has failed to respond to the demand letter.

65.    As a result of Mirtl's misconduct, the Lawrences bring this lawsuit to get back their money and property, as well interest, attorneys' fees and costs owed to them.

66.    In addition to this civil matter, the Lawrences have already provided preliminary information to the Federal Bureau of Investigation, and are also preparing to submit criminal complaints with the Office of the State

Attorney for Pasco County and the Denton County District Attorney.

67.    The Lawrences have engaged the undersigned law firm and are obligated to pay it a reasonable fee.

68.    The Lawrences have also complied with all conditions precedent to filing suit.

## <u>COUNT I – CONVERSION</u>

69.    The Lawrences repeat paragraphs 1 through 68, as if fully set forth herein.

70.    The Lawrences own the funds that Mirtl improperly transferred and/or from which he benefitted and lost sponsorship fees.

71.    The Lawrences also own certain removable property that Mirtl has refused to return, including race apparel and memorabilia that they have previously requested be returned.

72.    Mirtl wrongfully exercised dominion and control over the funds and apparel/memorabilia to the detriment of, and inconsistent with, the Lawrences' ownership rights thereto, when Mirtl received and/or used the funds and apparel/memorabilia for his benefit.

73.    Mirtl was not authorized by the Lawrences to dispose of the funds and retain the apparel/memorabilia, and, notwithstanding, Mirtl has wrongfully and permanently deprived the Lawrences of their property.

74.    Because Mirtl engaged in his misconduct willfully, recklessly and

maliciously (*i.e.*, egregiously), and with the intent directed to damage the Lawrences, the Lawrences will be seeking in the future an award of punitive damages.

WHEREFORE, the Lawrences ask this Court to enter a judgment against Mirtl for: (i) monetary damages in an amount according to proof; (ii) a return of certain removable property of the Lawrences, including race apparel and memorabilia; (iii) punitive damages; (iv) reasonable attorneys' fees and costs; and (v) such other and further relief that is just and proper.

## COUNT II – UNJUST ENRICHMENT

75.    The Lawrences repeat paragraphs 1 through 68, as if fully set forth herein.

76.    This is an equitable claim of unjust enrichment against Mirtl.

77.    Mirtl wrongfully and knowingly transferred, received and benefitted from the Lawrences' funds while unlawfully depriving the Lawrences of their funds in the subject Wells Fargo account(s).

78.    Similarly, Mirtl wrongfully and knowingly received and benefitted from certain removable property of the Lawrences, including race apparel and memorabilia that they have previously requested be returned.

79.    Mirtl has unjustly retained a direct benefit to the detriment of the Lawrences.

80.    Mirtl knew or should have known that he wrongfully and

unjustifiably received and/or benefitted from the Lawrences' funds and their apparel/memorabilia.

81. Under the circumstances, it would be inherently unjust, unfair, and inequitable for Mirtl to retain these benefits, which would represent an unjust windfall to Mirtl for his misconduct.

82. Based on the above alleged circumstances, equity dictates that Mirtl return to the Lawrences the total amount of misappropriated funds, as well as the removable property of the Lawrences, including race apparel and memorabilia.

83. As a direct and proximate result of Mirtl's retention and use of the misappropriated funds and removable property of the Lawrences (race apparel/memorabilia), the Lawrences have suffered damages.

84. Because Mirtl engaged in his misconduct willfully, recklessly and maliciously (*i.e.*, egregiously), and with the intent directed to damage the Lawrences, the Lawrences will be seeking in the future an award of punitive damages.

WHEREFORE, the Lawrences ask this Court to enter a judgment against Mirtl for: (i) monetary damages in an amount according to proof; (ii) a return of the memorabilia/apparel to the Lawrences; (iii) punitive damages; (iv) reasonable attorneys' fees and costs; and (v) such other and further relief that is just and proper.

## COUNT III – BREACH OF FIDUCIARY DUTY

85.    The Lawrences repeat paragraphs 1 through 68, as if fully set forth herein.

86.    Mirtl oversaw the deposits of funds belonging to the Lawrences into accounts, including Wells Fargo Account No. X-8049, for: (i) VIP access at races for their fans; and (ii) replica gear the Lawrences sold.

87.    During the course of the parties' dealings, Mirtl, as the Lawrences' sports agent for at least seven years, established a relationship of trust and confidence with the Lawrences.

88.    As their longtime sports agent, Mirtl worked with and/or for the Lawrences on an almost daily basis with the intention of obtaining their trust and confidence, thus creating a confidential relationship.  As a result of this confidential relationship, Mirtl owed a fiduciary duty to the Lawrences.

89.    Mirtl's role as their trusted sports agent caused the Lawrences to agree to entrust to Mirtl the funds they ultimately owned in bank accounts, including Wells Fargo Account No. X-8049.  Therefore, a fiduciary relationship existed at the time of opening these accounts and continued for the life of their sports agent relationship.

90.    The Lawrences placed their full faith and trust in Mirtl to properly handle the funds in any and all accounts.  Because Mirtl represented himself as a reputable sports agent with the requisite knowledge and experience in

this particular field to adequately pursue and accomplish the Lawrences'
stated objectives, a fiduciary relationship between the parties was created.

91.    Further, Mirtl had the skill, experience and knowledge regarding
handling the Lawrences' business affairs, including handling the deposits in
bank accounts, including Wells Fargo Account No. X-8049, upon which the
Lawrences justifiably relied thereon. Therefore, Mirtl owed the Lawrences a
fiduciary duty not to abuse that superior skill and knowledge.

92.    Mirtl breached his fiduciary duty to the Lawrences by, among
other things, misappropriating the Lawrences' funds and causing the
Lawrences to lose sponsorship fees from Alpinestars.

93.    Mirtl pulled off this scheme by lulling the Lawrences into a false
sense of security and by continually assuring them that the funds deposited in
bank accounts, including Wells Fargo Account No. X-8049, would be a
profitable and appropriate way for the Lawrences to sell: (i) VIP access at races
for their fans; and (ii) replica gear and merchandise the Lawrences sold.

94.    The Lawrences' losses were a direct and proximate result of Mirtl's
misappropriations and lost sponsorship fees. Moreover, the losses suffered are
indisputable and evidenced by a full and complete accounting of the activities
conducted in the accounts.

95.    As a result of the breaches of these duties, the Lawrences have
suffered damages.

WHEREFORE, the Lawrences ask this Court to enter a judgment against Mirtl for: (i) monetary damages in an amount according to proof; (ii) punitive damages; (iii) reasonable attorneys' fees and costs; and (iv) such other and further relief that is just and proper.

## COUNT IV – REPLEVIN

96.    The Lawrences repeat paragraphs 1 through 68, as if fully set forth herein.

97.    Mirtl has been in possession of certain removable property of the Lawrences, including race apparel and memorabilia that they have previously requested be returned.

98.    Mirtl, as the Lawrences' then-sports agent, had been holding and/or storing the property for the benefit of the Lawrences.

99.    Therefore, the location of this property is with Mirtl.

100.    The likely value of the property is thousands of dollars.

101.    The Lawrences are the owners of this claimed property and/or are entitled to possession of it, because the property is their own race apparel and their own memorabilia, and therefore they have clear title or right.

102.    The property has been wrongfully detained by Mirtl, and Mirtl has continued to detain the property in response to the Lawrences' termination of their sports agency relationship.

103.    The claimed property has not been taken for a tax, assessment, or

fine pursuant to law.

104.    The claimed property has not been taken under an execution or attachment against the property of the Lawrences.

WHEREFORE, the Lawrences ask this Court to enter a judgment against Mirtl for: (i) replevin of certain removable property of the Lawrences, including race apparel and memorabilia; (ii) punitive damages; (iii) reasonable attorneys' fees and costs; and (iv) such other and further relief that is just and proper.

## COUNT V – ACCOUNTING

105.    The Lawrences repeat paragraphs 1 through 68, as if fully set forth herein.

106.    This claim is pleaded in the alternative.

107.    The Lawrences own the funds that Mirtl has misappropriated, including in Wells Fargo Account No. X-8049.

108.    The Lawrences also own removable property, including race apparel and memorabilia that they have previously requested Mirtl to return.

109.    The Lawrences are entitled to obtain information from Mirtl regarding a list of all the improper transactions that he did in any and all bank accounts, including Wells Fargo Account No. X-8049, as well as information regarding the exact whereabouts and status of the race apparel and memorabilia at issue.

110.   The total amount of the Lawrences' monetary damages is currently unknown and uncertain, and thus an accounting is necessary.

111.   Under these circumstances, there is no adequate remedy of law.

112.   The Lawrences have attempted to obtain information from Mirtl, but he has refused.

WHEREFORE, the Lawrences ask this Court to enter a judgment against Mirtl for: (i) an accounting of such information; (ii) monetary damages in an amount according to proof; (iii) punitive damages; (iv) reasonable attorneys' fees and costs; and (v) such other and further relief that is just and proper.

## RESERVATION FOR PUNITIVE DAMAGES

The Lawrences expressly reserve their right to seek leave of Court to amend to seek punitive damages against Mirtl.

## JURY TRIAL DEMANDED

The Lawrences demand trial by jury for all matters so triable.

Dated: January 30, 2025                Respectfully submitted,

**SALLAH ASTARITA & COX, LLC**
*Counsel for the Lawrences*
3010 North Military Trail, Suite 210
Boca Raton, FL 33431
Tel.: (561) 989-9080
Fax: (561) 989-9020

/s/James D. Sallah
**James D. Sallah, Esq.**
Fla. Bar No. 0092584
Email: jds@sallahlaw.com
**Patrick J. Rengstl, Esq.**
Fla. Bar No. 0581631
Email: pjr@sallahlaw.com
**Joshua A. Katz, Esq.**
Fla. Bar No. 0848301
Email: jak@sallahlaw.com